# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER HUBBARD, | : | Case No. 1:13-CV-177 |
| Plaintiff, | : | |
| vs. | : | |
| CAROLYN W. COLVIN, | : | MEMORANDUM DECISION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | | |
| | : | |
| Defendant. | | |

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C § 636(c) and FED. R. CIV. P. 73, the parties voluntarily consented  to have the undersigned United States Magistrate Judge conduct any and all proceedings, including order the entry of a final judgment.   Plaintiff seeks judicial review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act); and Supplemental Security Income (SSI) under Title XVI of the Act.   Pending are the Briefs on the Merits of the parties and Plaintiff's Reply (Docket Nos. 16, 17 & 20).   For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II.  PROCEDURAL BACKGROUND.

On June 8, 2009, Plaintiff completed an application for DIB, alleging that she became unable to work On June 9, 2009 because of her disabling condition.   On June 17, 2009, Plaintiff applied for SSI, again alleging an onset date of  June 9, 2009 (Docket No. 10, pp. 180-182; 190-192 of 773).

The applications for DIB and SSI were denied initially and upon reconsideration (Docket No. 10, pp. 75-78; 80-82; 83-85; 93-95; 100-101 of 470).  On May 6, 2011, Plaintiff applied on her own behalf for Child Insurance Benefits (CIB) for which she was eligible under Title II of the Act[1] (Docket No. 10, pp. 217-218 of 773).  The onset date of her disability was amended to April 1, 2008 (Docket No. 10, p. 33 of 773).

On May 19, 2011, Plaintiff, represented by counsel, and Vocational Expert (VE) Fred A. Monaco, appeared before Administrative Law Judge (ALJ) Alfred J. Costanzo for hearing (Docket No. 10, p. 30 of 773).  On July 13, 2011, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability and DIB (Docket No. 10, pp. 12-24 of 773).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on November 20, 2012 (Docket No. 10, pp. 6-8 of 773).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III. FACTUAL BACKGROUND.

At the administrative hearing held in Cleveland, Ohio, Plaintiff testified that she lived in Ashtabula, Ohio, with her boyfriend of seven years and four children.  Plaintiff recounted that the seventh grade was the highest grade she completed,  and in 2003 or 2004, she obtained her general equivalency degree and certified nurse's aid (CNA) license (Docket No. 10, pp. 38-40; 64 of 773).  Plaintiff had a driver's license.  She shared the use of a vehicle with her fiancé (Docket No. 10, pp. 63 of 773).

---

[1] The Act provides that insurance benefits may be awarded to dependent children of a deceased, fully insured, wage earner.  42 U. S. C. § 402(d) (Thomson Reuters 2013).  Here, Plaintiff applied for CIB but there is no evidence that she pursued the proper administrative process or that she seeks judicial review of the denial of such benefits.

Plaintiff testified that she could no longer work because of paranoia, a lack of self-motivation, the occasional lack of transportation, the lack of child care, the effects of scoliosis and the aftermath of blackouts (Docket No. 10, pp. 57-58; 59; 60 of 773).  Her sporadic employment history included jobs at McDonald's Restaurant and Circle K.  However, her primary work was performed as a nurse's aide in nursing homes.  Most recently on February 2, 2011, she was discharged from her employment at the Geneva Village Retirement Community.  Plaintiff was given a "sign-on bonus" for work at Ashtabula County Nursing Home.  She was unsuccessful in performing this job because of excessive "call offs" and interpersonal conflicts with her co-workers (Docket No. 10, pp. 39- 47 of 773).

Plaintiff was prescribed antidepressants, Cymbalta® and Wellbutrin, while undergoing treatment at the Ashtabula Counseling Center in October 2007 (Docket No. 10, p. 48 of 773).  In April 2008, Plaintiff began community counseling at the Ashtabula Community Counseling Center (Docket No. 10, p. 47 of 773).  Plaintiff traced the onset of her paranoia back to a time after the birth of her second child.  Plaintiff suggested that her mood swings dated back to 2003 after the birth of her first child.  Even with treatment, the paranoia and mood swings were more severe (Docket No. 10, p. 47 of 773).

Plaintiff attributed her paranoid thinking, in part, to the smoking of marijuana daily during the Summer of 2009.  She quit smoking marijuana shortly after her treating psychiatrist, Dr. [Sarbjot Singh] Agit administered Promethazine, a medication used to change the actions of chemicals in the brain.  The injection was painful at the site and the side effects of the medication included muscular dystrophy in her face and hands.  Plaintiff obtained further medical treatment to counteract the effects of the injection (Docket No. 10, pp. 53; 62-63 of 773; STEDMAN'S MEDICAL DICTIONARY

334320 (27th ed. 2000)).

More recently, paranoia manifested itself as nightmares involving her children. Plaintiff suggested that the nightmares were intensified when she was taking Geodon®, an anti-psychotic medication used to treat schizophrenia and the manic symptoms of bipolar disorder. When taking this medication, she also suffered with suicidal ideations, chronic crying, fear of being alone, severe paranoia and thoughts of homicide. Apparently, Dr. Agit was working with Plaintiff to obtain a medication that controlled her symptoms as an alternative to commitment to a mental health rehabilitation facility (Docket No. 10, pp. 50-51; 61; 62 of 773; www.drugs.com/geodon.html).

Although the current medication regimen calmed her and reduced the number of auditory hallucinations, Plaintiff was prone to self-medication, refusing to take her medication if she felt "cured" or if she experienced intolerable side effects (Docket No. 10, pp. 55-57 of 773).

With respect to her exertional limitations, Plaintiff estimated that she could stand in one place for one half hour before the pain started and sit for one half hour or a little longer before the pain started. Walking was much harder so she was uncertain how long she could walk before the pain started. Plaintiff suggested that she could comfortably lift 20 pounds (Docket No. 10, pp. 59-60 of 773).

When questioned by counsel, Plaintiff recounted an incident in which she "blacked out a couple of times" and then went on a rampage, kicking in her front door and battering her fiancé (Docket No. 10, pp. 60-61 of 773).

Having familiarized himself with Plaintiff's vocational background, the VE, a retired professor of vocational studies and a current VE for the Office of Disability Adjudication and Review for the Social Security Administration, opined that Plaintiff had one type of work at the

substantial gainful activity level and that work was as a nursing home aide.  A certified nurse

assistant (CNA) would be considered semi-skilled work, requiring more than one month up to and

including three months for the CNA to learn the techniques, acquire the information and develop

the facility needed to perform this work, and the ability to engage in very heavy lifting that may

exceed

100 pounds (Docket No. 10, pp. 64; 128-133 of 773; www.onetonline.org/help/online/svp).

> Considering Plaintiff's age, educational background, and the CNA, assume that the
> hypothetical plaintiff can work at all exertional levels, but is limited to a single
> routine, repetitive tasks; minimal, if any, interaction with the public or co-workers;
> and a stable work environment with minimal change in the workplace from day to
> day, the VE opined that there would be other jobs in the national economy that
> would accommodate the hypothetical plaintiff.

> The VE provided a representative sample of jobs in the national economy that the

hypothetical plaintiff could perform:

| | | |
|---|---|---|
| 1. | Bench assembler/fabricator | 82,000 nationally |
| 2. | Coating, painting, decorating, light | 32,000 nationally |
| 3. | Building cleaner | 1.4 million nationally |

> If the hypothetical plaintiff were not able to maintain regular attendance due to

psychiatrically based symptoms, these jobs would be ruled out (Docket No. 10, pp. 64-65 of 773).


> Counsel asked the VE  whether a hypothetical person with an ongoing Global Assessment

of Functioning (GAF) score of approximately 50[2] would traditionally be able to do any kind of

---

[2]

Global Assessment of Functioning is a numeric scale of 0 through 100 used by mental health professionals to
rate, subjectively, the social, occupational and psychological functioning of adults or how well they meet various
problems in living.  A score of 50 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a
job, cannot work).  Www.ncbi nlm nih.gov.

competitive work on an ongoing competitive full-time basis?  The VE responded that a score of 50 "says serious" and that one of the factors in the serious category is an inability to keep a job (Docket No. 10, p. 66 of 773).

Counsel then asked:

If a person were limited . . .  capable of light level work, and had the mental impairments listed by the ALJ,  minimal interaction with co-workers and the public, stable work environment with minimal change and add the limitation of no production quotas, would there be jobs in the economy [that his hypothetical plaintiff could perform]?

Relying on his vast experience, the VE described the work this individual could perform as entry level, unskilled work that the typical worker could learn the techniques, acquire the information and develop the facility for average performance with a short demonstration or up to one month of training.  Usually production quotas were not an issue with these jobs.  The VE explained that the examples previously described in the sedentary and light categories would apply. The VE did define exceptions that would mean that the hypothetical plaintiff would not be able to adequately perform (Docket No. 10, pp. 66-67 of 773; www.onetonline.org/help/online/svp).

Again, the VE relied on his vast experience when explaining that one absenteeism was tolerated per month.  Additional absences  in entry level or unskilled positions would not be tolerated (Docket No. 10, p. 67 of 773).

## IV.  EDUCATIONAL BACKGROUND.

Plaintiff was an average student during elementary school.  In the fourth grade, school personnel administered personalized instruction, corrective classroom instruction and peer tutoring to assist Plaintiff with difficulties in reading, mathematics and English.  Most of her difficulty was attributed to lack of discipline and self motivation.  Three months after this intervention plan was

implemented, Plaintiff showed improvement but she still lacked self-motivation (Docket No. 10, pp. 358; 360 of 773).  During her seventh grade year in the Jefferson Local School System, Plaintiff earned failing grades in English, reading, life science and math.  Plaintiff's parents withdrew her from the Jefferson Local School System on December 9, 2003, intending to home school her (Docket No. 10, pp. 356, 357 of 773).

### V. PHYSICAL IMPAIRMENTS & TREATMENT EVIDENCE.

Prior to the onset date of her disability, Plaintiff was treated at University Hospital Health System Memorial Hospital of Geneva on numerous occasions:

| | |
|---|---|
| October 13, 1999 | Plaintiff shut her right hand in the car door.  No acute fracture of dislocation was observed in the X-rays (Docket No. 10, pp. 585-592 of 773). |
| April 15, 2000 | Plaintiff fell and hit her head.  The fall injured her neck.  The radiological evidence was negative for abnormality, fracture or dislocation of the cervical spine (Docket No. 10, pp. 575-584 of 773). |
| January 17, 2001 | Plaintiff fell and injured her left foot.  There was no fracture or dislocation noted; however, the radiologist questioned the widening of the lateral aspect of the tibiotalar joint compared to the medial aspect of the frontal view.  Ibuprofen was prescribed for pain (Docket No. 10, pp. 566-574 of 773). |
| April 1, 2001 | Plaintiff's entire body was red and itchy.  Diagnosed with an urticaria rash, Benadryl® was prescribed (Docket No. 10, pp.560-565 of 773). |
| July 28, 2003 | Plaintiff developed a fever, had chills and left flank pain. Dr. Patrick Gray, D.O., diagnosed Plaintiff with a urinary tract infection (UTI) and prescribed an antibiotic (Docket No. 10, pp. 550-559 of 773). |
| July 11, 2004 | Plaintiff smashed her left ring finger in a door.  There was no evidence of dislocation, fracture or intrinsic bone disease.  She was excused from work until July 13, 2004 (Docket No. 10, pp. 542-549 of 773). |
| March 6, 2005 | Plaintiff was coughing up blood.  No active disease was detected within her chest. Plaintiff was ultimately diagnosed with a bronchial syndrome (Docket No. 10, pp. 522-530 of 778). |
| February 12, 2005 | Plaintiff suffered from abnormal uterine bleeding due to pregnancy (Docket No. 10, pp. 531-534; 536-541 of 778) |
| February 14, 2005 | Plaintiff was diagnosed with "dysfunction uterine bleeding" (Docket No. 10, p. |

7

535 of 773).

| | |
|---|---|
| August 29, 2005 | Dr. Melissa Nielsen, M. D., diagnosed and treated Plaintiff for a UTI in pregnancy and threatened abortion.  Dr. Nielsen ordered complete bed rest pending further consultation with her treating physician (Docket No. 10, pp. 508-521 of 773). |
| December 20, 2005 | Plaintiff was prescribed Vicodin to treat back pain (Docket No. 10, pp. 647-648; 659 of 773). |
| December 26, 2005 | Plaintiff presented with left flank and lower back pain.  The ultrasonography revealed bilateral hydronephrosis, the swelling of the kidneys when urine flow is obstructed in any of part of the urinary tract (Docket No. 10, pp. 650-657 of 773; http://medical-dictionary.thefreedictionary.com/hydronephrosis ). |
| December 29, 2005 | Plaintiff was diagnosed with a single episode of syncope after fainting (Docket No. 10, pp. 636-646 of 773). |
| September 15, 2006 | Plaintiff presented with coughing and congestion.  She was diagnosed with sinusitis which became acute bronchitis (Docket No. 10, pp. 627-635 of 773). |

On March 9, 2007, Plaintiff underwent tests for Hepatitis B, Human Immunodeficiency Virus, rubella and rapid plasma reagin, a screening for syphilis.  The results from all three tests were non-reactive, meaning that none of the diseases were found in the testing samples (Docket No. 10, pp. 623-626 of 773; www.med.terms.com).

Plaintiff was pregnant when she presented to the Lake Hospital System (LHS) on March 19, 2007, complaining of abdominal pain.  Plaintiff's fetal membranes were intact and her pain stabilized upon discharge (Docket No. 10, pp. 404-406 of 773).

On April 13, 2007, Plaintiff presented to LHS with complaints of mild, irregular contractions and abnormal bleeding.  The fetal membranes were intact and Plaintiff was released with instructions to see her treating physician (Docket No. 10, pp. 401-403 of 773).  On April 30, 2007, Plaintiff presented to LHS and shortly thereafter, delivered a baby (Docket No. 10, pp. 396-400 of 773).

Plaintiff presented to Memorial Hospital of Geneva Emergency Medicine Services (MHG)

on July 8, 2007.  She had fallen and was experiencing back and leg pain.  X-rays of Plaintiff's spine showed normal vertical alignment and no evidence of fracture.  Plaintiff was prescribed a pain reliever and given a two-day pass from work (Docket No. 10, pp. 615-620 of 773).

On September 21, 2007, Plaintiff underwent a joint adjustment and manual therapy to resolve symptoms resulting from severe slouching, possible scoliosis and back pain.  Dr. Thomas D. DiSalvatore, D. C., administered additional treatments on September 24 and September 26, 2007.  Plaintiff reported "feeling better" and "sleeping better" as a result of the manipulation (Docket No. 10, pp. 363-367 of 773).

Plaintiff presented to the Ashtabula County Medical Center (ACMC) on February 2, 2008, with an inability to eat and she was vomiting.  An ultrasound confirmed the presence of a single live intrauterine pregnancy at six weeks two days gestational age.  The symptoms were attributed to the pregnancy (Docket No. 10, pp. 440-449 of 773).

On August 6, 2008, Plaintiff presented to LHS complaining that she fell on her buttocks.  No contractions resulted from the fall and the baby appeared to be unaffected by the fall (Docket No. 10, pp. 387-392 of 773).

Plaintiff presented to the LHS on August 9, 2008, complaining of back ache, flank pain and abdominal pain in the right lower quadrant.  On examination, Plaintiff was found to have suspicious pyelonephritis, an inflammation of the kidney and upper UT that usually results from noncontagious bacterial infection of the bladder, and urine cultures and blood cultures.  Results from the sonographic renal evaluation showed mild to moderate right-sided hydronephrosis.  Plaintiff was prescribed antibiotics and a pain reliever (Docket No. 10, pp. 385-386 of 773; http://medical-dictionary.thefreedictionary.com/pyelonephritis).

Plaintiff presented to the LHS on September 6, 2008, complaining of nausea and abdominal

9

cramping.  Diagnosed with occasional contractions, Plaintiff was discharged when all maternal and child health issues were resolved (Docket No. 10, pp. 378- 384 of 773).

Plaintiff was in labor when she was admitted to the LHS on September 13, 2008.  She gave birth and was released on September 15, 2008 (Docket No. 10, pp. 371-347  of 773).

Plaintiff underwent a laparoscopic bilateral tubal ligation on November 21, 2008 (Docket No. 10, pp. 369-370 of 773).

On April 13, 2009, Plaintiff presented to the ACMC with a myriad of symptoms, including abdominal pain, low back pain, diarrhea, fever, nausea, right flank pain and vomiting.  Several diagnostic tests were administered and she was treated for UTI and questionable pyelonephritis for which an antibiotic was prescribed (Docket No. 10, pp. 408-410; 415-423; 424-431; 436 of 773).

Results from blood and urine samples collected on April 13, 2009 were compared with samples collected on April 15, 2009 and April 16, 2009.  The results showed, *inter alia*, blood urea nitrogen and potassium levels that were lower than the normal reference range used by the laboratory services; magnesium and calcium levels increased within the normal reference range; total protein and albumin levels decreased below the normal reference range; and some abnormality in the clarity and the levels of protein and nitrates in Plaintiff's urine (Docket No. 10, pp. 413; 432-435; 437-439 of 773).  Plaintiff's red blood count and hemoglobin levels determined from blood donations made on April 15, 2009, were lower than the normal reference range (Docket No. 10, p. 414 of 773).

Plaintiff was still having right flank pain when she saw Dr. Anandhakrishnan Damodaran, M. D., on April 15, 2009.  Dr. Damodaran continued the prescription for the antibiotic, noting that Plaintiff had acute pyelonephritis and her asthma was stable (Docket No. 10, pp. 411-412 of 773).

Dr. Richard Krajec, M. D., an associate with the Ashtabula Clinic, treated Plaintiff for low

back pain, possible sprain on June 15, 2009.  Lodine, a non-steroidal, anti-inflammatory medication used to control pain and inflammation, was prescribed (Docket No. 10, p. 463 of 773; PHYSICIAN'S DESK REFERENCE, 2006 WL 378011(2006)).

Plaintiff presented to the ACMC Rehabilitation Center on June 19, 2009, for a physical therapy assessment.  Diagnosed with low back sprain with left sciatica, the physical therapist planned to decrease her symptoms and increase her strength and range of motion.  Plaintiff self-discharged after attending one of three scheduled visits (Docket No. 10, pp. 470-475 of 773).

Dr. Krajec recommended further physical therapy on July 1, 2009, for the reason that Plaintiff believed it was effective.  The prescription for Lodine was continued (Docket No. 10, p. 461 of 773).

Plaintiff presented to ACMC on November 1, 2009, complaining of body aches, pain, fever and back pain.  It was determined that Plaintiff had UTI symptoms and an upper respiratory infection/bronchitis.  There was no evidence of acute pulmonary process (Docket No. 10, pp. 678-690 of 773).

Plaintiff presented to the MHG on February 5, 2010, and was treated for tardive dyskinesia, an involuntary, repetitive tic-like movement that results from taking certain prescription medications.  Dr. Randy Curtin, D.O, started Plaintiff on Clonazepam, a medication used to treat seizures and panic disorders (Docket No. 10, pp. 609-614 of 773; www.webmd.com/drugs/Clonazepam).

On July 23, 2010, Plaintiff was treated at ACMC for acute dystonic drug reaction, an impairment manifested through involuntary, repetitive body motions.  Plaintiff had a similar reaction when taking anti-psychotic medications for schizophrenia so Benadryl® was prescribed (Docket No. 10, pp. 671-677 of 773).

11

On July 24, 2010, the attending physician at MHG, Dr. Christian Halloran, M.D., diagnosed Plaintiff with acute dystonic drug reaction and continued the Benadryl®. Dr. Halloran also placed Plaintiff on Cogentin, a medication used to treat Parkinson's disease or involuntary movements (Docket No. 10, pp. 594-608 of 773; www.webmd.com/drugs/Cogentin).

## VI. MENTAL IMPAIRMENTS & TREATMENT EVIDENCE.

Plaintiff referred herself to the Community Counseling Center (CCC) for psychiatric evaluation. On August 15, 2007, Plaintiff underwent a clinical interview during which she discussed her symptoms of depression and anxiety and discussed her psychological and/or life stressors. For effective treatment planning, the examiner used the five-level diagnostic system to classify Plaintiff's illnesses and disorders and to give a complete diagnosis that included the factors influencing Plaintiff's psychiatric condition:

| THE AXIS | IMPRESSIONS OF THE EXAMINER. |
|---|---|
| **I. Clinical Disorders** <br> This represents acute symptoms that need treatment. | Plaintiff has depression, not otherwise specified, and anxiety disorder, not otherwise specified. |
| **II. Personality Disorders and Intellectual Disabilities** <br> Axis II is for assessing personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II. | No diagnosis |
| **III. General Medical Condition** <br> Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders. | No diagnosis |
| **IV. Psychosocial and environmental Disorders** <br> Axis IV reports psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders | Problems with primary support group. |

| V. The GAF. | 45, a score denoting some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school |
|---|---|

Lexapro, a medication used to treat anxiety and major depressive disorders, was discussed as part of the pharmacological plan to manage Plaintiff's symptoms (Docket No. 10, pp. 760-773 of 773).

Approximately six months elapsed before Plaintiff returned to CCC for evaluation or treatment. On February 21, 2008, Amanda Hart, M. S., conducted a readmission interview during which Plaintiff admitted that she had been very angry lately and that with her pregnancy, she noticed intensified bouts of anger and tears. Plaintiff reported an inability to sleep and unexplained episodes of shakiness. Plaintiff was referred to Dr. Ronald Yendrek, D. O, a psychiatrist, for further study, diagnosis and treatment of any mental disorders (Docket No. 10, pp. 457-458 of 773; www.healthgrades.com/physician/dr-ronald-yendrek-2lfpq).

Plaintiff was admitted to the LHS on May 21, 2008, complaining of moodiness, mood swings and general depression. Concerned about the exposure of the fetus already to the toxins in nicotine and Geodon®, a medication used to treat bipolar disorders and schizophrenia, Dr. Bahman Sharif, M D., a psychiatrist, reluctantly started Plaintiff on a combination of Abilify®, a medication used to treat the symptoms of depression and Vistaril, a medication used to treat the symptoms of anxiety (Docket No. 10, pp. 393-394 of 773; www.healthgrades.com/physician/dr-bahman-sharif-35n5q; PHYSICIAN'S DESK REFERENCE, 2006 WL 367852 (2006); www.drugs.com).

On June 17, 2008, Plaintiff was pregnant when she presented to CCC. Succumbing to self diagnosis, Plaintiff had stopped taking Geodon® because it caused insomnia, suicidal ideations and a general feeling that she was "losing it." Dr. Yendrek, determined that Plaintiff should be placed

on Geodon® again (Docket No. 10, p. 455 of 773; www.healthgrades.com/physician/dr-ronald-yendrek-2lfpq; www.abilify.com; www.drugs.com).

Dr. C.G. Madsen, Jr., M. D., a psychiatrist, conducted a medical history review on August 25, 2008, during which Plaintiff affirmed that the dosage of her prescription for Geodon® had been increased in June 2008 and that she quit taking it in July 2008.  Plaintiff complained that she had gastrointestinal reflux disease at night.  To assure that the baby would not have withdrawal problems at birth, Dr. Madsen did not provide a replacement for Geodon® (Docket No. 10, p. 454 of 773; www.healthgrades.com/physician/dr-carl-madsen-ymfxt).

Plaintiff underwent a psychological/pharmacological progress evaluation on February 17, 2009, during which Plaintiff reported again that she had discontinued the Geodon® due to the side effects, specifically, her bad behaviors and crying episodes.  Plaintiff's mood was euthymic, there were no signs and symptoms of anxiety, depression or aggressiveness.  For effective treatment planning, Clinician Sammie Scott and Dr. Donald Hoffman, M.D., relied upon the five-level diagnostic system to classify Plaintiff's illness and disorders and give a complete diagnosis that included the following factors influencing Plaintiff's psychiatric condition:

| THE AXIS | IMPRESSIONS OF MR. SCOTT AND DR. HOFFMAN. |
|---|---|
| **I. Clinical Disorders** <br> This represents acute symptoms that need treatment. | Plaintiff has a mood disorder, not otherwise specified with psychotic features. |
| **II. Personality Disorders and Intellectual Disabilities** <br> Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually life-long problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II. | No diagnosis |
| **III. General Medical Condition** <br> Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders. | Rule out temporal lobe epilepsy. |

14

| IV. Psychosocial and environmental Disorders<br>Axis IV reports psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders | Stressors are moderately related to that which is delineated in the subjective/objective component of this progress note and Axis I and III diagnoses. |
|---|---|
| **V.  The GAF**. | 50 or serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work. |

(Docket No.10, p. 453 of 773).

Clinician Scott conducted a clinical interview for thirty minutes on May 14, 2009, and he found Plaintiff to be fully alert and oriented, her affect was flat and her mood was mildly dysphoric; her cognition and memory were grossly intact; her thought content was consistent with paranoid thinking; and her judgment and insight were considered adequate.  Plaintiff's global assessment of functioning was reduced to 40, a score denoting some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  Plaintiff was prescribed Risperdal®, a medication used to treat schizophrenia and the symptoms of a bipolar disorder; and Klonopin®, a medication used for the treatment of panic disorders (Docket No. 10, p. 451-452 of 773; www.gafscore.com; PHYSICIAN'S DESK REFERENCE, 2006 WL 393358 (2006); PHYSICIAN'S DESK REFERENCE, 2006 WL 387499 (2006)).

Dr. Joan Williams, Ph. D., completed the PSYCHIATRIC REVIEW TECHNIQUE form and addressed Plaintiff's medical disposition for the period beginning on June 9, 2009.  Dr. Williams determined that there was documented evidence of a mood disorder.  In her opinion, the degree of functional limitations resulting from Plaintiff's mental disorders was:

15

1.  Restriction of Activities in Daily Living            None
2.  Difficulties in maintaining social functioning        Mild
3.  Difficulties in maintaining concentration, persistence or pace    Mild
4.  Episodes of decompensation, each of extended duration    None.

There was no evidence of "C" criteria.  In other words, there was no evidence reflecting the existence of an extremely severe mental condition of at least two years' duration that caused more than a minimal limitation in the ability to do any basic work activity (Docket No. 10, pp. 476-489 of 773).

Barbara Padgett, M.S.W., L.I.S.W., conducted a diagnostic assessment on November 2, 2009 during which she administered three tests:

1.  BURNS ANXIETY INVENTORY — A list of symptoms that create anxious feelings, anxious thoughts and anxious physical symptoms. This assessment tool measures anxiety. Www.lovestrong.com/article/q67655-burns-anxiety-checklist/).

2.  BURNS DEPRESSION CHECKLIST — A list of three categories which indicate how much this type of feeling has bothered the test taker in the past week including the day he or she takes the test (www.nwsamaritans.org/forms/Burns_Depression_Checklist.pdf).

3.  MOOD DISORDER QUESTIONNAIRE — Developed by a team of psychiatrists, researchers and consumer advocates to address a critical need for timely and accurate diagnosis of bipolar disorder. (Www.mooddisorderquestionnaire.net/).

The results of the tests are unknown (Docket No. 10, p. 504 of 773).

On January 28, 2010, Dr. Karen Steiger, Ph. D., completed a case analysis and determined that Plaintiff was doing well, that her condition was not worsening and there was no evidence to suggest that she had the incapacity to get along with others.  It was Dr. Steiger's opinion that Plaintiff had exaggerated her symptoms (Docket No. 10,  p. 497 of 773).

16

Plaintiff presented to Dr. Ajit, a psychiatrist, on February 3, 2010, with a simple request "I need help." Plaintiff complained that she was not sleeping well, that she had guilt feelings and that she stopped attending school. Dr. Ajit diagnosed Plaintiff with a schizoaffective disorder for which Invega®, a medication used to treat schizophrenia and schizoaffective disorders, was prescribed. Further, Dr. Ajit opined that Plaintiff's global assessment of functioning was 40, a score denoting some impairment in reality testing or communication *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (Docket No. 10, pp. 502-503 of 773; www.Invega.com; www.gafscore.com).

On March 17, 2010, Dr. Ajit addressed the apparent side effects that resulted from the consumption of Invega®. Plaintiff was hearing voices intermittently and she continued to struggle with paranoia. Dr. Ajit started Plaintiff on a medication used to treat schizophrenia (Docket No. 10, p. 501 of 773).

On July 20, 2010, Plaintiff underwent a thirty-minute medication management with Dr. Ajit. Plaintiff admitted that she was self-medicating with alcohol and that she continued to have intermittent auditory hallucinations. Plaintiff had stopped taking Risperdal® because she felt better. Dr. Ajit discontinued the Risperdal® and discussed use of intramuscular injections to change the chemicals in the brain and somehow manage the symptoms of schizophrenia (Docket No. 10, p. 698 of 773). On July 22, 2010, the injection was made and the possible side effects of the medication were reviewed (Docket No. 10, p. 696 of 773).

Plaintiff suffered from akathisia, a syndrome characterized by an inability to remain in a sitting posture, with motor restlessness and a feeling of muscular quivering. Plaintiff was prescribed Clonazepam, a medication capable of suppressing the spike and wave discharge in the absence of

17

seizure and decreasing the frequency, amplitude, duration and spread of discharge in minor motor seizures (Docket No. 10, p. 695 of 773; STEDMAN'S MEDICAL DICTIONARY 11060 (27th ed. 2000); PHYSICIAN'S DESK REFERENCE, 2006 WL 387499 (2006)).

On September 1, 2010, Dr. Ajit discontinued the diagnosis of paranoid schizophrenia based on recent history given by Plaintiff and the collateral information given by Plaintiff's biological father. Dr. Ajit prescribed Concerta®, a central nervous system stimulant used to provide therapeutic action in attention deficit hyperactivity disorders (Docket No. 10, p. 693 of 773; PHYSICIAN'S DESK REFERENCE, 2006 WL 372522 (2006)).

On March 8, 2011 and March 12, 2011, Plaintiff was treated at ACMC for abdominal pain; flank pain; vomiting and diarrhea; and a headache.  Plaintiff's white and red blood counts were susceptible to disease and her urine was hazy.  The computed tomography of the abdomen and pelvis was negative for abnormality (Docket No. 10, pp. 738-758 of 773).

Plaintiff presented to ACMC on April 1, 2011 with a harsh, moist cough; diarrhea; vomiting; abdominal and flank pain.  Plaintiff's white and red blood counts were abnormal but her chest X-ray results were stable and unremarkable.  There was evidence of small bilateral ovarian cysts (Docket No. 10, pp. 710-735 of 773).

Plaintiff presented to ACMC on April 5, 2011 with respiratory complaints.  Plaintiff's platelet count was below the normal reference range.  Results from her chest X-ray were unremarkable.  She was ultimately treated for an upper respiratory infection (Docket No. 10, pp. 700-710 of 773).

18

## V.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 3d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id*.  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final

step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings using the five-step sequential analysis:

Step one:    Plaintiff had not attained the age of 22 as of April 1, 2008, the alleged onset date. Plaintiff had not engaged in substantial gainful activity since April 1, 2008, the alleged onset date.

Step two:    Plaintiff had severe impairments, namely, an affective disorder, ADD and alcohol and drug abuse.

Step three:  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations:

a.    Limited to simple, routine, repetitive tasks;
b.    Minimal interaction with co-workers and the public;
c.    No ongoing teamwork with co-workers;
d.    Stable work environment with minimal changes in the workplace from day to day.

Step four:   At all time relevant to this decision, Plaintiff was unable to perform any past relevant work.

Step five:   Considering that Plaintiff was a younger individual with at least a high school education, the ability to communicate in English and a residual functional

20

capacity to perform a full range of work at all exertional levels, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

Conclusion:   Plaintiff has not been under a disability, as defined in the Act from April 1, 2008 through the date of the decision on July 13, 2011 (Docket No. 10, pp. 15-24 of 773).

## VII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id*. at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable

21

latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

### VIII. ANALYSIS.

Plaintiff seeks reversal and remand of the ALJ's decision based on the following.

1. Plaintiff's residual functional capacity finding does not accommodate her moderate limitations in concentration persistence and pace:

2. The ALJ never considered Plaintiff's absenteeism.

3. The ALJ never considered her subjective limitations.

4. Plaintiff's residual functional capacity does not consider pain.

5. The hypothetical question posed to the VE does not accurately reflect her limitations.

In response Defendant argues:

1. The ALJ's decision is consistent with the statutory and regulatory scheme for evaluating disability claims.

2. The ALJ accounted for all of Plaintiff's limitations in determining residual functional capacity for a modified range of unskilled work.

## A.  THE LAW–RESIDUAL FUNCTIONAL CAPACITY.

A person who has no impairment(s) would be able to do all basic work activities at normal levels; he or she would have an unlimited functional capacity to do basic work activities.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).  What a person can still do despite an impairment, is called his or her residual functional capacity.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).

The responsibility for determining a claimant's residual functional capacity resides with the ALJ. *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D.Ohio,2011) (*see* 20 C.F.R. §§ 404.1546(c)).  In rendering a residual functional capacity decision, the ALJ must (1) give some indication of the evidence upon which he or she is relying, and (2) not ignore evidence that does not support the decision, especially when that evidence, if accepted, would change the analysis.  *Id.* (*See Bryan v. Commissioner of Social Security*, 383 Fed.Appx. 140, 148 (3rd Cir.2010) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3rd Cir.2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [ . . . ] contradictory, objective medical evidence' presented to him.")); *Baltazar v. Astrue*, 2011 U.S. Dist. LEXIS 4641, *22 (W.D.Ark. Jan. 18, 2011) (*citing Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir.2009); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

### 1.  MODERATE LIMITATIONS IN CONCENTRATION PERSISTENCE AND PACE

Plaintiff argues that this residual functional capacity does not consider that she has moderate

limitations in concentration, persistence and pace:

> the claimant is limited to simple, routine, repetitive tasks with minimal interaction with co-workers and the public, she should not have any ongoing teamwork with co-workers, and the claimant needs a stable work environment with minimal change in the workplace from day to day (Docket No. 10, p. 19-20 of 773).

According to Social Security regulations, concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. *Scott v. Commissioner of Social Security*, 2013 WL 237296, *15 (N.D.Ohio,2013) *report and recommendation adopted by* 2013 WL 237192 (N.D.Ohio, 2013) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00)). Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. *Id*. (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. *Id*. (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00). Wherever possible a mental status examination or psychological test data should be supplemented by other available evidence. *Id*. (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

> We will assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis . . . You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks . . . However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions. *Id*.

Determination of these functional limitations is a complex and highly individualized process that requires the consideration of multiple issues and all relevant evidence. *Id.* at *16 (*citing* 20 C.F.R. §§ 404.1520a, 416.920a). The category of concentration, persistence or pace refers to the "ability

24

to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

The ALJ conducted a methodical review of Plaintiff's limitations in concentration, persistence and pace when formulating Plaintiff's residual functional capacity. The ALJ referred to several factors which he took into consideration commonly found in Plaintiff's testimony that supported a finding that Plaintiff's mental impairments only caused moderate restrictions in maintaining concentration, persistence or pace. By her own admission, Plaintiff was not compliant with her medication regimen and she occasionally self-medicated. There were no psychological test results but the results from mental status examinations advanced by several clinicians that showed when medication compliant, Plaintiff was able to relate to her physicians and exhibit linear, logical and goal-directed thought processes. She had the capacity to engage with her examiners, she was alert and she was able to concentrate.

The ALJ also considered Plaintiff's limitations in concentration, persistence or pace in "life" settings such as her daily activities and her work history (Docket No. 10, p. 22 of 773). Plaintiff offered nothing persuasive in her life activities or work history that supported the alleged difficulties with concentration, persistence and pace that would be work preclusive. This diminished the probability that Plaintiff had deficiencies in her ability to concentrate, persist or maintain pace to the extent that she alleged or that she was incapable of any production standard on a sustained and continuous basis.

Plaintiff's ability to engage in limited to simple, routine, repetitive tasks provided that she has minimal interaction with co-workers and the public and that she works in a stable environment with minimal day-to-day changes adequately accounts for and reasonably translated into a finding

25

that the ALJ assigned Plaintiff mental restrictions in her residual functional capacity that were self-paced, could withstand short periods of inattention and did not mandate team work or require quotas. The ALJ adequately considered these limitations on Plaintiff's ability to perform work-related activities when assessing residual functional capacity (Docket No. 10, pp. 19-22 of 773).  Remand is not necessary to determine whether the ALJ took into account Plaintiff's moderate limitations in concentration, persistence and pace when assessing Plaintiff's residual functional capacity.

    2.  **ABSENTEEISM.**

Plaintiff testified that she lost many jobs due to "call offs."  Her counsel asked about absenteeism merely as a hypothetical to the VE even though the medical evidence did not demonstrate that Plaintiff would be unable to work due to extensive absenteeism.  The VE explained that given his vast experience, one absenteeism per month was tolerated and anything beyond that in an entry level or unskilled position would not be tolerated.

The ALJ did not disregard Plaintiff's testimony altogether; neither was the ALJ inclined to give Plaintiff's testimony considerable weight.  In considering the 20 C. F. R. § 404.1527(d)-factors, the ALJ relied upon Plaintiff's testimony that she "called in" for reasons unrelated to her health. Generally, she had issues with co-workers that caused her to "call off" (Docket No. 10, p. 43 of 773).

In other words, the ALJ found no support for Plaintiff's likely absenteeism in the opinions rendered by her treating sources.  Plaintiff has not pointed to any objective medical evidence in the record that bears on the absenteeism issue at an unacceptable level and none of Plaintiff's treating sources account for the alleged repetitive nature of her absenteeism in her impairments.

The VE did not opine that Plaintiff would be disabled given her rate of absenteeism or that

26

the level of absenteeism was critical in determining whether Plaintiff had the ability to perform a significant number of jobs in the national economy.  Neither did the VE testify that Plaintiff's residual functional capacity assessment would result in a rate of absenteeism that would exceed the customary tolerances of potential employers.

Rejecting Plaintiff's supposition on the basis that its lacks clinical or diagnostic support is permissible.  The Magistrate will not disturb the ALJ's decision to attribute minimal weight to Plaintiff's absenteeism opinion.

### 3.  THE SUBJECTIVE RESTRICTIONS.

Plaintiff suggests that the ALJ failed to include any exertional limitations in her residual functional capacity despite documented history of physical limitations and her testimony that she cannot sit or stand longer then 30 minutes at a time and she has a greater problem walking.

Here, Plaintiff's argument conflates the nature of residual functional capacity with the responsibility for making the residual functional capacity determination.  The Commissioner's regulations clearly show that the ALJ is responsible for making the residual functional capacity determination by considering all of the symptoms and the extent that such symptoms were consistent with the objective medical evidence.  The ALJ considered the substantial body of evidence in assessing residual functional capacity and determined that Plaintiff's residual functional capacity allowed her to perform a full range of work at all exertional limitations.  Plaintiff's claims were not reduced by exertional or non-exertional factors as there were no limitations and restrictions attributable to medical source opinions.  Plaintiff has not cited any evidence from the record to contradict the ALJ's finding.

Contrary to Plaintiff's allegations, the ALJ's residual functional capacity assessment in this

27

case, exclusive of Plaintiff's subjective conclusions about her functional abilities, is supported by substantial evidence.

### 4.  PAIN AND RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff asserts that "the residual functional capacity should include symptoms such as pain along with medically determinable impairments" (Docket No. 16, p. 12 of 13).

The undersigned Magistrate reiterates that residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairments, including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.  TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184 (July 2, 1996).

Here, the ALJ asserted that he fully considered the entire record in assessing residual functional capacity.  He considered that Plaintiff had intermittent complaints of pain but there was no evidence of a definitive diagnosis that explained the alleged intensity and limiting effects described by Plaintiff.  Based on the less than distinct nature of Plaintiff's back pain, the ALJ was not able to correlate such pain to Plaintiff's functional limitations (Docket No. 10, p. 18 of 773).

The Magistrate is persuaded that the ALJ incorporated this lack of substantial evidence establishing pain when making the residual functional capacity determination.

### B.    THE HYPOTHETICAL QUESTION

Plaintiff suggests that the Commissioner failed to sustain the burden at step five of the sequential evaluation for the reason that ALJ failed to posit a hypothetical question to the VE that included her moderate limitations in concentration, persistence and pace.  According to Plaintiff,

because none of the hypothetical questions included restrictions addressing these limitations, the ALJ erred in relying on the hypothetical to determine Plaintiff's residual functional capacity.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Scott, supra*, 2013 WL 237296, at *18 (*citing Mousseau v. Commissioner of Social Security*, 2012 WL 271379, *5 (E.D.Mich., 2012) (unreported) (*citing Ealy v. Commissioner of Social Security,* 594 F.3d 504, 516 (6th Cir.2010)).  There is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks.  *Id.* (*citing Benton v. Commissioner of Social Security*, 511 F.Supp.2d 842, 849 (E.D.Mich.2007) (citation omitted)). However, there is also authority that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.  *Id.* (*See, e.g., Hess v. Commissioner of Social Security*, No. 07–13138, 2008 WL 2478325, at *7–8 (E.D. Mich. June 16, 2008) (citation omitted)).

In support of her contention that the ALJ's hypothetical question and the resulting residual functional capacity did not sufficiently address her moderate difficulties in concentration, persistence and pace, Plaintiff cites to *Ealy, supra*, 594 F.3d at 516.  The Magistrate finds that *Ealy* is distinguishable from this case.  In *Ealy*, the record showed that Dr. Scher, a non-examining source, specifically limited Ealy's ability to sustain attention to complete simple repetitive tasks to two-hour segments over an eight-hour day where speed was not critical.  *Id.*  This description of Ealy's abilities spoke only to some of the restrictions in pace, speed and concentration.  *Id.*  The ALJ

streamlined the hypothetical, omitting speed and pace based restrictions completely and the Sixth Circuit concluded that the ALJ failed to capture Ealy's limitations in concentration, persistence, and pace adequately. *Id.*

*Ealy* undoubtedly stands for the proposition that an ALJ's hypothetical to a VE must adequately describe a claimant's limitations in order to serve as substantial evidence in support of the ALJ's conclusions. *Harvey v. Colvin*, 2013 WL 1500688, *11 (N.D.Ohio,2013) (*citing Ealy,* 594 F. 3d at 517). However, Ealy "does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace." *Id.* (*citing Jackson v. Commissioner of Social Security*, No. 1:10–CV–763, 2011 WL 4943966, at *4 (N.D.Ohio Oct.18, 2011) (Boyko, J.)). Rather, "Ealy stands for a limited, fact-based[ ] ruling in which the claimant's particular moderate limitations required additional speed and pace-based restrictions." *Id.* (*citing Jackson*, 2011 WL 4943966, at 4).

Here, the record supports a finding that the ALJ gave Plaintiff the benefit of doubt, considering that the State agency psychological consultant Dr. Joan Williams, determined that Plaintiff had only  mild, non-severe limitations in this regard (Docket No. 10, pp. 19, 22 of 773). The ALJ took into account the equivalent of moderate limitations in concentration, persistence and pace but never made the traditional reference to moderate limitations in concentration or pace in the hypothetical.  Using alternate examples that accurately and adequately accounted for the equivalent of moderate concentration, persistence and pace deficiencies, the ALJ noted that Plaintiff maintained some variable ability to perform simple routine, repetitive tasks; and that she was limited in her interaction with the public or co-workers; and she was limited to a stable work environment with minimal change in the workplace from day to day.  Inherent in the ALJ's hypothetical question was

an exclusion of quotas, production expectancies, or special interaction with the public and coworkers that requires a degree of sustained concentration, persistence or pace.  These limitations may be read cumulatively to encompass moderate concentration, persistence or pace deficiencies and they therefore, adequately capture any restrictions in Plaintiff's ability to sustain concentration, persistence or pace.

Plaintiff has not pointed to evidence in the record contradicting the ALJ's conclusion on this issue.  The undersigned Magistrate finds that the record supports the conclusion that Plaintiff's particular moderate limitations did not require restrictions in addition to those assigned by the ALJ and a remand is not warranted on this issue.

### C. THE CONCLUSION.

The ALJ considered the entirety of Plaintiff's medical evidence in calculating residual functional capacity, applied the correct legal standards in reaching his decision and substantial evidence supports that conclusion.  Similarly, the ALJ proposed a hypothetical question to the VE that incorporated the properly phased equivalent of moderate limitations in concentration, persistence and pace.  For these reasons, the undersigned Magistrate Judge concludes that the ALJ's finding that Plaintiff could perform a full range of work at all exertional levels and was therefore not disabled within the meaning of the Act is supported by substantial evidence.

### IX.  CONCLUSION

The Magistrate affirms the Commissioner's decision..

/s/Vernelis K. Armstrong
United States Magistrate Judge.

Date:    September 30, 2013

## XII.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.